IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHAD ANDREW STITES,

        Plaintiff,

v.

SHERIFF DAVID MAHONEY,
MICHAEL PLUMER and
DR. JASMIN YUSUF-SAFAVI,

        Defendants.[1]

OPINION AND ORDER

12-cv-383-wmc

---

Plaintiff Chad Andrew Stites filed this lawsuit to challenge the conditions of his confinement at the Dane County Jail under 42 U.S.C. § 1983. Defendants have filed a motion for summary judgment, arguing that the complaint must be dismissed because Stites failed to exhaust available administrative remedies. (Dkt. # 50.) For reasons set forth below, the court will grant that motion and dismiss the complaint.

FACTS[2]

In 2006, Stites was confined as a pretrial detainee in the Dane County Jail. Defendant David Mahoney is currently employed as Dane County Sheriff. From March to September 2006, Captain Michael Plumer was employed as the Dane County Jail Administrator. During that same time period, Dr. Jasmin Yusuf-Safavi was employed by a third-party medical services contractor, Corizon Correctional Healthcare, as a physician at the Jail.

---

[1] Plaintiff was granted leave to proceed with claims against Dane County Sheriff David Mahoney, a John Doe administrator and a Jane Doe physician. Defendants have since identified Michael Plumer as the John Doe defendant and Dr. Jasmin Yusuf-Safavi as the Jane Doe defendant in this case. Accordingly, the court has corrected the defendants' names for purposes of clarifying the record.

[2] The following facts are taken from defendants' proposed findings, which plaintiff never directly opposed, and indeed largely concedes in plaintiff's brief in opposition and accompanying documents to the extent inconsistent with the proposed facts.

In February and March 2006, Stites was treated at the Jail with a topical corticosteroid for psoriasis, which is a chronic skin disease characterized by scaly patches on the surface of the skin. On March 19, 2006, Stites submitted a sick call slip, informing the jail's licensed practical nurse of a possible spider bite sustained on March 14. The nurse noted that the bite, which was white in color, was on Stites's right hand and was surrounded by significant swelling. She promptly requested that a physician assess the bite, scheduling an appointment for March 20, 2006. Meanwhile, a physician ordered staff to administer an antihistamine (Benadryl) and an anti-inflammatory pain reliever (Ibuprofen).

On March 20, 2006, Stites was examined by a physician at the Jail. The physician continued the order for Benadryl and Ibuprofen, adding Tylenol for pain. The physician also ordered Stites to change his bandage dressing daily. Stites was scheduled for a follow-up appointment on March 22.

Before his follow-up appointment could occur, Stites reported to the nursing station on March 21, 2006, complaining of an infection. He complained of increased pain and swelling at his right hand, knees and ankles. A nurse noted that Stites's right hand was "very swollen" and warm to the touch. The nurse made the decision to have Stites transferred to Meriter Hospital to address his complaints of pain. Within the hour, Stites was transported to Meriter Hospital for further treatment.

From March 21 through March 27, 2006, Stites received in-patient care at Meriter Hospital. On March 21, Meriter Hospital staff sent a sample culture to the lab for analysis and performed an irrigation and debridement procedure on Stites's right hand.

While awaiting the lab results, Stites was also administered various antibiotics and referred for a consultation with a hand surgeon.

On March 22, the lab report advised that Stites's culture tested positive for Methicillin Resistant Staphylococcus Aureus ("MRSA"). The hand surgeon concluded that antibiotics had been effective and that Stites should continue to change the dressings and wash the wound with a disinfectant (Chlorehexidine). On March 24, the hand surgeon also performed another irrigation and debridement of the abscess on Stites's right hand. Meriter Hospital staff continued to oversee Stites's progress until his discharge on March 27, 2006.

Following Stites' discharge from Meriter Hospital, the attending physician ordered that he continue to take an antibiotic (Bactrim DS), to soak his right hand in 1% Betadine for 10-15 minutes, and to cover with a dry dressing. Stites received follow-up care at the Jail on March 28, March 29, and April 3, when his sutures were removed.

On April 4, Stites filed a grievance alleging that he had neither been given bandages after his sutures were removed nor received instructions for dressing changes, soaking procedures and rehabilitation exercises. Stites noted further that he was experiencing pain, discomfort and numbness in his hand, which was affecting his sleep. The same day he filed this grievance, Stites was given pain medication (Ibuprofen) for seven days in response to his claim that pain in his hand was waking him up during the night.

On April 8, the physician caring for Stites continued his prescription for the antibiotic Bactrim DS, to be administered for seven days. The physician also increased

Stites's daily dose of ibuprofen from 600 mg to 800 mg per day.  Finally, the physician explained that it was Stites's responsibility to soak his hand and perform range of motion exercises two to three times per day.  The following day, April 9, the physician ordered that Tylenol replace the prescription for Ibuprophen after Stites complained of stomach pain.

On April 10, jail officials concluded that Stites's April 4th grievance was unfounded.  A written response summarized the care that Stites received, including the inpatient stay at Meriter Hospital, and then stated as follows:

> On [March] 28th once you arrived back here you were seen in the med office for a dressing change.  A betadine soak was done and it was noted [that] your sutures were intact[, that] [t]he circulation to the site . . . was good and that you had no complaint of discomfort.  As per doctor's order[s] you were to have the wound cleaned three times daily until totally closed.  The nurse instructed you that day that you could shower but to wrap [the] hand before doing so.  It was also ordered you be started on an oral antibiotic Bactrim DS one, four times daily for 7 days.  The following day our doctor saw you and again it was noted your circulation was good, you were healing well, and your temperature was normal.  On April 3rd your sutures were removed and the doctor felt you would be able to resume your work duties within a 2-3 day time frame from that visit.

(Dkt. # 54, Exh. 11.)  Stites did not file an appeal from this grievance.

Instead, Stites continued to receive care at the Jail.  He was treated for pain in his right side on April 11 and April 13.  He was also treated for tingling in his right hand on May 18.

On June 6, Stites reported to medical staff that he had a boil on his cheek and another at the nape of his neck.  A physician immediately ordered cultures for lab testing and administered the antibiotic Bactrim DS.

On June 8, Stites filed a second grievance.  He complained that his vital signs had

4

not yet been taken and that he had not received the results of his lab tests. He reported feeling "achy all over" as though there was an "infection running through [his] body." Not surprisingly, Stites was concerned that he was experiencing complications from MRSA, which he believed could endanger his life if it spread to his organs. (Dkt. # 54, Exh. 12.)

On June 12, the lab results came back and indicated that Stites again tested positive for MRSA. This time, Stites refused an incision and drainage procedure, or any other intervention by jail medical personnel. Medical staff called Meriter Hospital and scheduled an appointment for Stites in July 2006. Meanwhile, jail medical staff gave Stites bandages to cover the boils on his neck and face and scheduled a follow-up appointment with a physician. Stites was also placed in medical isolation, out of contact with other inmates. Stites continued to be treated with antibiotics during this time.

The following day, on June 13, Stites was seen by a physician for a follow-up appointment. After the physician was unable to find medical records for Stites's June 12th appointment, Stites filed a third grievance, expressing concern that his medical records had been lost or compromised. (Dkt. # 54, Exh. 14.)

On June 16, jail personnel found that Stites's second grievance was "not substantiated" and replied as follows:

> After review of your medical record and after discussion with nursing staff, I am sorry if you felt our staff did not respond in an appropriate and timely manner to your medical concerns. I do see, however, that you have been seen by at least two of our physicians here at the jail three dates in June, the 10th, 12th and 13th. You are currently on an antibiotic to treat your condition and you have been scheduled for an outside appointment to have an Incision and Drainage (I&D) done of your wound site in the coming weeks. I have requested the day nurse come to your cellblock and

5

>speak with you today (June 16) to see how you are doing. If you continue to experience pain/discomfort you will be given a more detailed assessment and examination. I again apologize for any inconvenience this has caused.

(Dkt. # 54, Exh. 12). Stites filed an appeal from this response, disputing that he was promptly treated. In particular, Stites noted that he was not seen on June 8th or 9th, when he was experiencing chest pain from being "scared for [his] life." (Dkt. # 53, Exh. 13.)

On June 16, medical staff checked Stites's wounds and noted that they were clean, intact and without drainage. On June 19, the physician attending to Stites ordered that he continue taking Bactrim DS for an additional week. Medical staff observed no drainage from his wounds and Stites reported no pain. Medical staff also again advised Stites about hygiene and prevention of MRSA. On June 20, Dr. Yusuf-Safavi cleared Stites to move out of medical isolation.

On June 26, jail personnel also determined that Stites's third grievance was "unfounded," explaining as follows:

>After review of your medical record and after discussion with medical and nursing personnel I would like to apologize if you feel that your records may have been compromised in some manner, that vital information necessary for one doctor to convey to another may have been lost. I do see however the progress notes are all in place and do show that you were seen on the 12th and 13th of June by two different doctors and that one performed an incision and drainage procedure on you. You have been on antibiotics during these past weeks and reports indicate your infection is clearing. I again apologize if you have felt there might be a break in communication of our health care staff as we work together to provide you optimal care, but do feel confident that is not the case. We will continue to monitor your progress and hope you continue to do well.

(*Id*.) Stites did not appeal from the denial of his June 13 grievance.

In July, August and September 2006, jail medical staff continued to monitor

Stites's hand, neck and face for signs of MRSA. After Stites left Dane County Jail at the end of December 2006, however, he again tested positive for MRSA again on January 12, 2007, December 23, 2007, November 6, 2008 and February 8, 2009, while in custody of the Wisconsin Department of Corrections.

## OPINION

In 2012, Stites filed this lawsuit under 42 U.S.C. § 1983, alleging that supervisory officials at the Jail failed to adopt a policy or take reasonable measures to stop the spread of MRSA and were deliberately indifferent to the serious risk that this type of infection posed to the inmate population. Based on these allegations, the court granted him leave to proceed with a claim under the Fourteenth Amendment Due Process Clause and/or the Eighth Amendment against policymakers at the Jail. Noting that Stites did not file a grievance regarding the claim that he presents in this case, defendants move for summary judgment on the grounds that he did not exhaust available administrative remedies as required by the Prison Litigation Reform Act (the "PLRA"), 42 U.S.C. § 1997a(e).

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Summary judgment is appropriate if there are no genuinely disputed material facts, and if on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The applicable substantive law will dictate which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). A factual

dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must construe all facts in favor of the nonmoving party. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). Even so, the non-movant may not simply rest on the allegations in his pleadings; rather, he must respond by presenting specific facts that would support a jury's verdict in his favor on his claims. *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

Relevant here, the PLRA prohibits any civil action by a prisoner in federal court under 42 U.S.C. § 1983 concerning "prison conditions" until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement found in § 1997e(a) applies to all inmate suits about prison life, "whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The Supreme Court has repeatedly emphasized that § 1997e(a) mandates exhaustion of all administrative procedures before an inmate can file any suit challenging prison conditions. *See Booth v. Churner*, 532 U.S. 731, 739 (2001); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *see also Jones v. Bock*, 549 U.S. 199, 212 (2007) (confirming that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court").

The Dane County Jail has adopted a grievance procedure for its inmate population. (Dkt. # 54, Exh. 15.) That procedure, set forth in § 607.07 of the Sheriff's Security Services Manual, permits inmates to submit grievance forms no later than ten days after the event giving rise to the grievance. If the inmate properly asserts a complaint, then the reviewing officer investigates and makes a determination on the merits of the complaint, indicating whether it is rejected, substantiated, not substantiated, exonerated or unfounded. If the inmate is dissatisfied with the determination, then he may submit an appeal within ten days of its issuance. A jail supervisor will then have seven days in which to review and adjudge the appeal. All inmates at the Jail are apprised of this procedure by way of the Inmate Handbook.

In this lawsuit, Stites maintains that he contracted MRSA as the result of unsanitary conditions at the Jail and that a recurrence resulted because supervisory officials failed to implement an adequate policy to prevent the spread of infectious disease. As outlined above, however, Stites did not file a grievance complaining about these issues. Instead, his grievances took issue with the medical treatment that he received to treat his MRSA infection. As defendants correctly note, issues concerning the provision of medical care differ substantively than those concerning the need for hygienic conditions of confinement.

As the Supreme Court recognized in *Porter v. Nussle*, "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." 534 U.S. at 524. By requiring

9

exhaustion of administrative remedies, Congress hoped that "corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Id.* (citing *Booth*, 532 U.S. at 737). In addition to filtering out potentially frivolous claims, Congress also believed that internal review would facilitate adjudication of cases ultimately brought to court by giving prison officials an opportunity to develop an administrative record that clarifies the contours of the controversy. *Id.* (citations omitted). Moreover, the Supreme Court has emphasized that the PLRA, 42 U.S.C. § 1997e(a), requires "proper exhaustion," *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), including compliance with prison procedural rules.

Stites nevertheless appears to claim that he was not required to present or exhaust his administrative claims about his 2006 MRSA infection in a grievance because by the time he filed his lawsuit in 2012, he was no longer in custody at the Jail. This argument is meritless as a matter of undisputed fact. Stites contracted MRSA in March of 2006 and again tested positive in June of that year. Stites remained in custody of the Dane County Jail through the end of 2006, giving him ample time to file a grievance concerning Jail conditions pursuant to the grievance procedure found in § 607.07 of the Sheriff's Security Services Manual.

Despite having had ample time to file a grievance concerning the conditions of his confinement at the Jail, Stites deliberately bypassed the administrative review process. (Prisoners may not deliberately bypass the administrative process by flouting an institution's procedural rules). Since "[a] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies, and thus is

foreclosed by § 1997e(a) from litigating," *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002), *See Woodford*, 548 U.S. at 96-98. Plaintiff's failure to complete the grievance process violates the PLRA's exhaustion requirement in 42 U.S.C. § 1997e(a), mandating exhaustion *before* filing suit. Because it is undisputed that Stites failed to exhaust available administrative remedies before filing suit in federal court, his complaint must be dismissed without prejudice.[3]

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. # 50) is GRANTED.

2) The complaint is DISMISSED without prejudice for plaintiff Chad Andrew Stites's failure to exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a).

Entered this 27th day of August, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[3] Defendants also present uncontradicted evidence that there was a detailed policy in place to prevent the contraction and spread of infectious diseases, such as MRSA during the time Stites was confined at the Dane County Jail. Noting that Stites was treated according to this policy and related protocols, defendants argue further that he cannot establish a failure to implement or enforce an adequate policy. Because it is clear that Stites did not exhaust available administrative remedies in this instance, however, the court need not reach this alternative grounds for summary judgment.